UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL ZARATE, | No. C 08-3896 SI (pr) |
| Plaintiff, | **ORDER DISMISSING FEDERAL CLAIMS AND REMANDING CASE TO STATE COURT** |
| v. | |
| JAMES TILTON, et al., | |
| Defendants. | |

## INTRODUCTION

Manuel Zarate, an inmate at Pelican Bay State Prison, filed this pro se civil action in state court and defendants removed it to federal court under 28 U.S.C. § 1441(b) because a federal question was raised under 42 U.S.C. § 1983. Defendants have filed a motion for the court to screen the complaint under 28 U.S.C. § 1915A and plaintiff has filed motions for the court to exercise supplemental jurisdiction and for the court to order service of process on two unserved defendants. For the reasons discussed below, the court dismisses the § 1983 claims for failure to state a claim upon which relief may be granted, declines to exercise supplemental jurisdiction over the state law claims remaining, and remands the case to state court so that Zarate may litigate his state law claims there.

## BACKGROUND

The complaint concerns two unrelated problems Zarate has with prison officials: his gang inactivity reviews and the confiscation of two magazines. The complaint alleges the following regarding the federal claims:

Gang Inactivity Review: The first subject area of the complaint concerns prison officials' refusal to release Zarate from the security housing unit ("SHU") as an inactive gang affiliate. Complaint, ¶¶ 20-35, 39-55. Zarate currently is in administrative segregation ("ad-seg") in the SHU at Pelican Bay based on his validation as an affiliate of the EME prison gang in 1990. He has been in ad-seg since 1990. He does not complain about his initial placement, or any particular periodic review of that placement, but instead about the inactivity reviews during which prison officials determine whether to release a previously validated gang affiliate from ad-seg.

Zarate had inactivity reviews in 2000, 2002, and 2005-2006 to determine whether he was inactive in the gang and could be released from ad-seg. He was denied inactive status following each of these reviews. In addition to complaining about the decision denying him inactive status, he complains about the adequacy of the review of that decision and the quality of the information on which the decision-makers relied.

Zarate asserts claims under the Eighth and Fourteenth Amendments and Ex Post Facto Clause of the U.S. Constitution, as well as various state law claims based on these alleged facts.

Denial of Magazines: The second subject area of the complaint concerns prison staff rejecting two specific magazines that had been mailed to Zarate. On January 23, 2006, correctional captain M. Yax issued a notice of disapproval of the February 2006 issue of Maxim Espanol magazine. Complaint, ¶ 35. The stated reason for the disapproval was that the magazine was sexually explicit and depicted frontal nudity on several pages. See id. at ¶ 36 and Exh. C. In the notice, Yax cited 15 Cal. Code Regs. § 3006(c)(17), a regulation regarding contraband. Section 3006(c)(17) provides that an inmate may not possess any matter which contains or concerns "[s]exually explicit images that depict frontal nudity in the form of personal photographs, drawings, magazines, or other pictorial format." Zarate filed an inmate appeal claiming that the regulation was overbroad and contrary to Miller v. California, apparently referring to the landmark obscenity case of Miller v. California, 413 U.S. 15 (1973). See Complaint, Exh. C. That inmate appeal was rejected by several defendants.

On May 26, 2006, captain Yax issued a notice of disapproval of the May 2006 issue of

United States District Court
For the Northern District of California

1  Maxim Espanol magazine. The stated reasons for the disapproval were that the magazine
2  depicted frontal nudity and posed a serious threat to the facility security or inmate and staff
3  safety. Complaint, Exh. C. In the notice, Yax cited the part of the regulation regarding
4  depictions of frontal nudity, 15 Cal. Code Regs. § 3006(c)(17), and also cited to a subsection
5  providing that "[a]nything in the possession of an inmate which is not contraband but will, if
6  retained in possession of the inmate, present a serious threat to facility security or the safety of
7  inmates and staff, shall be controlled by staff to the degree necessary to eliminate the threat," 15
8  Cal. Code Regs. § 3006(d). Zarate filed an inmate appeal, and it was rejected by several
9  defendants.

10  He asserts claims under the First and Fourteenth Amendments of the U.S. Constitution,
11  as well as various state law claims based on these alleged facts.

**DISCUSSION**

A.   Review of Complaint

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. §1915A(a). The court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. See 28 U.S.C. §1915A(b)(1),(2).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

1.   Discretionary Release From The SHU

Interests that are procedurally protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and laws of the states. See Meachum v. Fano, 427 U.S.

3

1   215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty.
2   Changes in conditions so severe as to affect the sentence imposed in an unexpected manner
3   implicate the Due Process Clause itself, whether or not they are authorized by state law. See
4   Sandin v. Conner, 515 U.S. 472, 484 (1995) (citing Vitek v. Jones, 445 U.S. 480, 493 (1980)
5   (transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-22 (1990)
6   (involuntary administration of psychotropic drugs)). Plaintiff's is not a case involving changes
7   so severe as to implicate the Due Process Clause itself.

8   Deprivations that are less severe or more closely related to the expected terms of
9   confinement may also amount to deprivations of a procedurally protected liberty interest,
10  provided that state statutes or regulations narrowly restrict the power of prison officials to
11  impose the deprivation and that the liberty in question is one of "real substance." See id. at 477-
12  87. A state most commonly restricts the power of prison officials by a two-step process: (1)
13  establishing "substantive predicates" to govern official decisionmaking, i.e., "particularized
14  standards or criteria to guide the [s]tate's decisionmakers," and then (2) requiring, "in explicitly
15  mandatory language," that if the substantive predicates are met, a particular outcome must
16  follow. See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 461-64 (1989). An
17  interest of "real substance" will generally be limited to freedom from restraint that imposes
18  "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison
19  life" or "will inevitably affect the duration of [a] sentence," Sandin, 515 U.S. at 484, 487.

20  There is some uncertainty as to whether Sandin has eliminated the requirement that state
21  law narrowly restrict the power of prison officials to impose the deprivation and instead requires
22  only that there be an interest of real substance to determine that an inmate has a right to due
23  process before being deprived of that interest. In Sandin, the Court criticized earlier decisions
24  that focused on the language of the regulations rather than the nature of the interest because they
25  "encouraged prisoners to comb regulations in search of mandatory language on which to base
26  entitlements to various state-conferred privileges." Sandin, 515 U.S. at 481. The language-
27  based approach in which courts and prisoners searched for negative implication from mandatory
28  language in prisoner regulations had "strayed from the real concerns undergirding the liberty

4

protected by the Due Process Clause." <u>Id.</u> at 483. States "may under certain circumstances create liberty interests which are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484. <u>See</u> <u>Jackson v. Carey</u>, 353 F.3d 750, 755 (9th Cir. 2003) ("focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship"); <u>Duffy v. Riveland</u>, 98 F.3d 447, 457 (9th Cir. 1996) (implying that <u>Sandin</u> reformulated working definition of liberty interest to include only "real substance" prong).

While there may be some uncertainty as to whether the court needs to find mandatory language creating the liberty interest, there is no uncertainty at all that an atypical and significant hardship must exist to find that a liberty interest is protected by the Due Process Clause. <u>Sandin</u> made clear the need for an atypical and significant hardship and the Supreme Court recently reiterated its adherence to <u>Sandin</u>'s rule in <u>Wilkinson v. Austin</u>, 545 U.S. 209, 222-24 (2005). Whether the due process analysis after <u>Sandin</u> has two prongs – i.e., (1) an atypical and significant hardship and (2) a state-created interest due to mandatory language – or just one prong, it is beyond dispute that at least the first prong is required.

The liberty interest in not being subjected to the harsh conditions of the Pelican Bay SHU on an indefinite basis is <u>not</u> at issue in this claim, nor is the due process requirement that inmates so confined receive periodic review of their SHU placement.[1]  Rather, the claim pertains to the

---

[1] Existing case law explains that due process requires some sort of periodic review of the inmate's confinement in the SHU that is more than a meaningless gesture. <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 477 n.9 (1983); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1101-02 (9th Cir. 1986). The periodic reviews of SHU placement occur regardless of whether an inmate is under consideration for release as an inactive gang affiliate. The periodic reviews are done by the ICC, rather than the DRB. <u>See</u> 15 Cal. Code Regs. § 3341.5(c)(2)(A). The DRB's activities are not the periodic review required for inmates placed in the SHU indefinitely. To the extent there was a liberty interest in not being kept in the SHU as a prison gang affiliate without procedural protections, Zarate does not contend that he did not have those periodic reviews required under <u>Hewitt</u> and <u>Toussaint</u>.

5

1  review of Zarate's case for his possible release from the SHU as an inactive gang affiliate.

2  Zarate did not have a protected liberty interest in having prison officials comply with the state regulations regarding inactive gang affiliates, regardless of the existence of the periodic reviews by the ICC. Where, as here, the conditions of confinement did not change at all -- Zarate was in the SHU before, during and after defendants' activities -- there was no imposition of a restraint that imposed an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.[2] His claim fails on the first prong of <u>Sandin</u> because he was not deprived of an interest of real substance.

If the due process analysis has two prongs after <u>Sandin</u>, Zarate's claim would fail also on the second prong because he has misread the applicable regulations and ignored their discretionary nature. The regulations permit, but do not require, the review of the active/inactive status of an inmate and permit, but do not require, the release from the SHU of an inmate determined to be an inactive gang member or associate. "As provided at section 3378(e), the Departmental Review Board (DRB) <u>may</u> authorize SHU release for prison gang members or associates categorized as inactive. The term inactive means that the inmate has not been involved in gang activity for a minimum of six (6) years. . . . The DRB <u>is authorized to retain an inactive gang member or associate in a SHU</u> based on the inmate's past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or institutional security." 15 Cal. Code Regs. § 3341.5(c)(5) (emphasis added). Section 3378(e), in turn, provides: "An inmate housed in a security housing unit (SHU) as a gang member or associate <u>may</u> be considered for review of inactive status by the Department Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years." Section 3341.5 does not establish substantive predicates and does not require in explicitly mandatory language that if certain substantive predicates are met, a particular outcome must follow. See <u>Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. at 461-64. The regulation's permissive language gave

---

[2] There also was no inevitable effect on the duration of Zarate's confinement because he was in custody on an indeterminate life sentence. See Complaint, ¶28.

6

1  Zarate no constitutionally protected right to a review of his file or to release from the SHU based
2  on his gang inactivity. Section 3341.5(c)(5) allows the retention in the SHU of even an inactive
3  gang member or associate. The regulation is discretionary, not mandatory, and therefore does
4  not create a protected liberty interest and cannot be the basis for a federal due process claim.
5  This means that Zarate's claim would fail on the second prong of the due process analysis, if that
6  prong still exists after Sandin.

7  Zarate also contends that the changes in the time period between inactivity reviews
8  violated his rights under the Ex Post Facto Clause. There was no ex post facto violation based
9  on the facts alleged in the complaint. "'Changes in a prisoner's location, variations of daily
10 routine, changes in conditions of confinement (including administrative segregation), and denials
11 of privileges - matters which every prisoner can anticipate are contemplated by his original
12 sentence to prison - are necessarily functions of prison management that must be left to the broad
13 discretion of prison administrators.'" Jones v. Murray, 962 F.2d 302, 309 (4th Cir. 1992)
14 (citation omitted). "It is precisely because reasonable prison regulations, and subsequent
15 punishment for infractions thereof, are contemplated as part of the sentence of every prisoner,
16 that they do not constitute additional punishment and are not classified as ex post facto.
17 Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations
18 over another, reasonable amendments, too, fall within the anticipated sentence of every inmate."
19 Id. at 309-10; see also Gilbert v. Peters, 55 F.3d 237, 238 (7th Cir. 1995) (Clause "does not
20 prohibit every alteration in a prisoner's confinement that may work to his disadvantage"). Any
21 change in the regulations or rules regarding the inactivity reviews and ad-seg retention did not
22 violate the Ex Post Facto Clause.

23 Zarate also claims that the conditions in the SHU violate his Eighth Amendment rights.
24 The claim cannot proceed. As an inmate in the SHU, Zarate is a member of plaintiff class in the
25 Madrid v. Gomez class action litigation concerning the SHU conditions. Judge Henderson in
26 that case has ruled that the overall conditions of the SHU do not violate the Eighth Amendment
27 for the non-mentally ill inmates therein. See Madrid v. Gomez, 889 F.Supp. 1146, 1227-30,
28 1260-65 (N.D. Cal. 1995). Zarate may not relitigate the claim individually.

7

### 2. Disallowance of Magazines Depicting Frontal Nudity

The allegations in the complaint and the attachments thereto reveal that the magazines not allowed to be delivered to Zarate displayed nudity banned by the CDCR regulation. Zarate does not claim otherwise (and apparently could not do so in good faith because he was not allowed to see the magazines). Rather, he claims that the policy banning him from receiving magazines displaying nudity violates his constitutional rights. Prisoners retain those First Amendment rights not inconsistent with their status as prison inmates or with legitimate penological objectives of the corrections system. See Pell v. Procunier, 417 U.S. 817, 822 (1974). Regulations limiting prisoners' access to publications or other information are valid only if they are reasonably related to legitimate penological interests. See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); Crofton v. Roe, 170 F.3d 957, 959 (9th Cir. 1999). In Turner, the Supreme Court identified four factors to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives", or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90.

The Ninth Circuit, sitting en banc, found that a ban on nudity like the one challenged here to be constitutional under all four prongs of the Turner analysis set forth above. Mauro v. Arpaio, 188 F.3d 1054, 1059-63 (9th Cir. 1999) (en banc). Like the CDCR regulation, the policy at issue in Mauro banned "sexually explicit material," defined as "materials that show frontal nudity" including "personal photographs, drawings, and magazines and pictorials that show frontal nudity." Id. at 1057. Moreover, like the policy at issue in Mauro, the CDCR policy doubtless is aimed at providing "an atmosphere conducive to rehabilitation" and that prevents "a hostile environment from occurring for both inmates and employees." See Mauro, 188 F.3d

8

at 1059-60 (ban on aimed at maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers). In three unpublished cases, the Ninth Circuit has upheld the CDCR's ban on depictions of frontal nudity. Nelson v. Woodford, 249 Fed. Appx. 529, 530 (9th Cir. 2007) ("The district court properly concluded that the regulations prohibiting Nelson's possession of obscene or sexually explicit material, 15 Cal. Code Reg. §§ 3006(c)(15) & (17), respectively, are constitutional because the regulations' underlying policies are reasonably related to legitimate penological interests"); Jost v. Lockyer, 127 Fed. Appx. 358 (9th Cir. 2005) (upholding dismissal upon screening under 28 U.S.C. § 1915A); Munro v. Tristan, 116 Fed. Appx. 820, 821(9th Cir. 2004) (upholding dismissal upon screening under 28 U.S.C. § 1915A). Because the CDCR policy does not materially differ from the policy upheld in Mauro, the complaint does not state a claim for a constitutional violation based on the implementation of that policy that resulted in disallowance of magazines depicting frontal nudity. That there was an additional reason for rejection of the second magazine does not affect the analysis since the regulation banning depictions frontal nudity supported the disallowance of the magazine.

### 3. Inmate Appeals

Zarate also apparently is attempting to assert a separate federal constitutional claim for the denial or improper handling of his various inmate appeals regarding the inactivity review and the disallowed magazines.

The failure to grant an inmate's appeal in the prison administrative appeal system does not amount to a due process violation. There is no federal constitutional right to a prison administrative appeal or grievance system for California inmates. See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996). The denial of an inmate appeal is not so severe a change in condition as to implicate the Due Process Clause itself and the State of California has not created a protected interest in an administrative appeal system in its prison. California Code of Regulations, title 15 sections 1073 and 3084.1 grant prisoners a purely procedural right: the right to have a prison appeal. The regulations simply

9

1  require the establishment of a procedural structure for reviewing prisoner complaints and set
2  forth no substantive standards; instead, they provide for flexible appeal time limits, see Cal.
3  Code Regs. tit. 15, § 3084.6, and, at most, that "no reprisal shall be taken against an inmate or
4  parolee for filing an appeal," id. § 3084.1(d).  A provision that merely provides procedural
5  requirements, even if mandatory, cannot form the basis of a constitutionally cognizable liberty
6  interest.  See Smith v. Noonan, 992 F.2d 987, 989 (9th Cir. 1993); see also Antonelli, 81 F.3d
7  at 1430 (prison grievance procedure is procedural right that does not give rise to protected
8  liberty interest requiring procedural protections of Due Process Clause).

9  Zarate had no federal constitutional right to a properly functioning appeal system.  An
10 incorrect decision on an administrative appeal or failure to process the appeal in a particular way
11 therefore did not amount to a violation of his right to due process. The claims concerning the
12 handling of the administrative appeals are dismissed for failure to state a claim upon which relief
13 may be granted.

14

15 B.   Remand

16 With the dismissal of the § 1983 claims, there remain for adjudication several state law
17 claims pled in the complaint.  The court declines to exercise supplemental jurisdiction over the
18 state law claims now that the federal question claims have been dismissed.  See 28 U.S.C. §
19 1367(c)(3).  Zarate ought to be allowed to litigate his state law claims in state court where he
20 first asserted those claims.  The case therefore will be remanded to state court.  See Swett v.
21 Schenk, 792 F.2d 1447, 1450 (9th Cir. 1986) ("it is within the district court's discretion, once the
22 basis for removal jurisdiction is dropped, whether to hear the rest of the action or remand it to
23 the state court from which it was removed"); Plute v. Roadway Package System, Inc., 141 F.
24 Supp. 2d 1005, 1007 (N.D. Cal. 2001) (court may remand sua sponte or on motion of a party).
25 Zarate's motion for the court to exercise supplemental jurisdiction is DENIED.  (Docket # 8.)
26 The dismissal of the federal claims and remand to state court also means that Zarate's
27 motion for the court to order service of process on two unserved defendants will be DENIED
28 as moot.  (Docket # 9.)

10

**CONCLUSION**

Defendants' motion for an initial screening is GRANTED. (Docket # 2.) This order is the initial screening order. The claims asserted under 42 U.S.C. § 1983 are dismissed without leave to amend. With the dismissal of the § 1983 claims, only state law claims remain, and the court declines to exercise supplemental jurisdiction over them.

The action is remanded to the Del Norte County Superior Court for such other and further proceedings as that court deems proper. The clerk shall close the file and send the necessary materials to the Del Norte County Superior Court for the remand.

IT IS SO ORDERED.

Dated: February 9, 2009

_____
SUSAN ILLSTON
United States District Judge